UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>EHW CONSTRUCTORS, A JOINT VENTURE; SKANSKA USA CIVIL, INC.; SKANSKA USA CIVIL SOUTHEAST, INC.,; AMERICAN BRIDGE COMPANY; NOVA GROUP, INC., *in personam*,<br><br>Defendants. | No. 3:16-cv-05475-RBL<br><br>IN ADMIRALTY<br><br>DECLARATION OF R. RUSSELL JOHNSON<br><br>**NOTE ON MOTION CALENDAR: DECEMBER 8, 2017** |

I, R. Russell Johnson, declare the following under penalty of perjury of the laws of the State of Washington.

1. I am over eighteen years of age and competent to make this declaration of my own personal knowledge. I was retained by defendants to act as an expert witness in this matter and have provided an Opinion Report and a Supplemental Opinion Report. Copies of these reports are attached to this Declaration as Exhibit 1 and Exhibit 2.

DECLARATION OF R. RUSSELL JOHNSON – PAGE 1
CAUSE NO. 3:16-cv-05475-RBL

1962226 / 237.0005

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON 98164-1039
(206) 689-8500 • (206) 689-8501 FAX

My opinions and observations below are consistent with those contained in my reports, which are incorporated by reference as if fully set forth here.

2. I currently hold a 1600 ton Master Oceans license with an endorsement as Master of Towing Vessels which I have held continuously for 40 years. I have made many trips on the waters of Puget Sound as Captain of towing vessels from 9000 hp ocean going tug boats to 1000 hp harbor tugs. I have extensive experience in investigation accidents and injuries aboard vessels owned by companies I've worked for and have received U.S. Coast Guard approval as a "Qualified Instructor" for 16 different licensing courses at the Pacific Maritime Institute located in Seattle, Washington, including Seamanship, Shiphandling, Radar, Bridge Resource Management, Navigation, Rules of the Road, Watchkeeping, and Officer in Charge of a Navigation Watch.

3. The 1972 Collision Regulations promulgated by the U.S. Coast Guard, known as the 72 COLREGS applied to the operation of the patrol boat at the time of the allision at issue in this lawsuit. The operator of the patrol boat violated Rule 5 (proper lookout), Rule 6 (safe speed), and Rule 7 (radar) by failing to post a proper lookout, by proceeding at an unsafe speed in waters where known navigational hazards existed, and by failing to utilize available radar equipment. Each of these failures directly contributed to and were a cause of the allision.

4. The reports of the U.S. Marines on board the patrol boat show that their vision looking in from the patrol boat towards their destination was very restricted due to "blinding" lights on the pier shining in their eyes. Regardless of whether or not

DECLARATION OF R. RUSSELL JOHNSON – PAGE 2
CAUSE NO. 3:16-cv-05475-RBL

FORSBERG & UMLAUF, P.S.
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON 98164-1039
(206) 689-8500 • (206) 689-8501 FAX

1962226 / 237.0005

mooring lines were hypothetically piled on the mooring buoy and regardless of whether or not the hypothetical pile of lines blocked a view of the light from the patrol boat looking towards the buoy, which would also entail looking into the blinding lights on the pier that were only 100 feet or so away, the light on the mooring buoy would likely not have been seen by the master of the patrol boat.

5. The violations of 72 COLREGS Rule #5, Rule #6, and Rule #7, combined with the negligent actions of the master in travelling at an unsafe speed at night in severely restricted visibility in an area where fixed objects were known to be located were the cause of the allision, not anything to do with the condition of the buoy or the mooring lines attached to it.

DATED at __3 P.M.,__ this __13th__ day of November, 2017.

By: ___R. Russell Johnson___
R. Russell Johnson

DECLARATION OF R. RUSSELL JOHNSON – PAGE 3
CAUSE NO. 3:16-cv-05475-RBL

1962226 / 237.0005

FORSBERG & UMLAUF, P.S.
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON 98164-1039
(206) 689-8500 • (206) 689-8501 FAX

## CERTIFICATE OF SERVICE

The undersigned certifies under the penalty of perjury under the laws of the State of Washington that I am now and at all times herein mentioned, a citizen of the United States, a resident of the State of Washington, over the age of eighteen years, not a party to or interested in the above-entitled action, and competent to be a witness herein.

On the date given below I caused to be served the foregoing **DECLARATION OF R. RUSSELL JOHNSON** on the following individuals in the manner indicated:

| | |
|---|---|
| Ms. Annette L. Hayes<br>Ms. Kerry J. Keefe<br>United States Attorney<br>700 Stewart Street, Suite 5220<br>Seattle, WA 98101<br>Facsimile: 206-553-0755<br>( x ) Via ECF | Ms. Vickey L. Quinn<br>Mr. Chad Readler<br>Mr. R. Michael Underhill<br>U.S. Department of Justice<br>Torts Branch, Civil Division<br>450 Golden Gate Avenue<br>P.O. Box 36028<br>San Francisco, CA 94102<br>( x ) Via ECF |

**SIGNED** this 14th day of November, 2017, at Seattle, Washington.

*/s/ Shannon Walker*
Shannon D. Walker

DECLARATION OF R. RUSSELL JOHNSON – PAGE 4
CAUSE NO. 3:16-cv-05475-RBL

1962226 / 237.0005

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON 98164-1039
(206) 689-8500 • (206) 689-8501 FAX

# EXHIBIT 1

R. Russell Johnson
RJ Maritime Associates, LLC
465 Davis Bay Road
Lopez Island, Washington 98261

Date: August 16th, 2017
Subject Opinion: USN vs EHW Construction

---

OPINION REPORT

I have been asked by Mr. Paul Smith, of the law firm Forsberg & Umlauf to provide a professional opinion of the circumstances surrounding the collision of a high speed patrol boat operated by U.S. Navy personnel with a mooring buoy near the explosive handling wharf near Naval Base Kitsap-Bangor.

In preparation for this report I have reviewed the following documents:
1. Initial Disclosures of the United States
2. Order for Supplies or Services for repair of Moose Boat 36PB0605
3. Invoice for services from Delphinus Engineering, Inc.
4. Solicitation offer and award form 1442
5. Joe Maquire Travel Report
6. U.S. Navy Demand for Reimbursement
7. Mona Carlson Barge Incident memo April 5th, 2013
8. Damage Inspection Photo Album by Jason Marshall 20 August, 2013
9. Defendants Initial Disclosures
10. Letter to M.W. Devry, Department of the Navy from Pat Moore, Project Manager, January 30, 2015.
11. Mooring diagrams EHWEHW 0016 to 0022
12. First Amended Complaint of the United States of America
13. Defendants' Answer to Plaintiff's First Amended Complaint
14. Answer to Plaintiff's first set of Interrogatories
15. Navigation Rules & Regulations Handbook

By way of background and relevant to this matter I currently hold a 1600 ton Master Oceans license with an endorsement as Master of Towing Vessels which I have held continuously for over 40 years. During my career I have been the Captain of towing vessels ranging from 9000 horsepower ocean going tug boats to 1000 horsepower harbor tugs. I have made hundreds of trips on the waters of Puget Sound.. I have called at every port on the West Coast at one time or another and sailed extensively to Alaskan ports and foreign ports worldwide. I have operated as a civilian mariner in the service of U.S. Navy and other U.S. Government Contracts.

I started my management career with Crowley Maritime Corporation in 1984 and was the Operation Manager and later General Manager for Crowley in the San Francisco Bay area. I

1

was transferred to Seattle in 1990 and promoted to Operations Manager for the West Coast and Alaska. During this time I was responsible for the safe operation of over 100 vessels. During my tenure at Crowley we successfully bid and serviced numerous contracts for shipwork, towage, and marine construction for the U.S. Navy.

I started working in management for Dunlap Towing Company in 2000 as the Director of Safety, Training, and Regulatory Compliance and served in that capacity until my retirement in June, 2012. In this capacity I was responsible for implementing the International Safety Management System which is the recognized and often required system of the International Maritime Organization. In 2004 I received internal auditor training qualifying me to do the ISM internal audits for my company. I was also responsible to ensure that the company operated within the guidelines of the Responsible Carrier program of the American Waterway Operators. I had been a member of the AWO Regional Safety Committee for 12 years prior to my retirement and in 2007 began serving on the AWO Board of Directors for the Western Region. For over 10 years I served on the Seattle based U.S. Coast Guard Puget Sound Safety Committee.

For over 30 years I have been responsible for investigating hundreds of accidents and injuries aboard vessels owned by the companies I have worked for. The chief reason for these investigations has been to determine the root cause of the incident. I have received Root Cause Analysis and Incident Investigation training and certification from the American Bureau of Shipping through the Marine Industry RCA/Incident Investigation Course. I have also received Safety Management System Training with emphasis on Risk Assessment and Safe Management Practices through Pacific Maritime Institute, Seattle Washington. I have received U.S. Coast Guard approval as "Qualified Instructor" for 16 different licensing courses at Pacific Maritime Institute, Seattle, Washington. Courses include Seamanship, Shiphandling, Radar, Bridge Resource Management, Navigation, Rules of the Road, Watchkeeping, and Officer in Charge of a Navigation Watch.

Based on this experience and the review of the above mentioned documents I have arrived at the following observations and opinions:

Observations:

1. On or about May 9th, 2012, the United States, by and through Naval Facilities Northwest (NAVFAC Northwest), issued contract N44255-12-C-3008 to EHW Constructors, a Joint Venture, for the construction of an explosives handling wharf at Naval Base Kitsap-Bangor. (First Amended Complaint of the United States of America) This contract is not in evidence in this case and has not been made available to me. I have not had an opportunity to review it, and I have no idea what the basic operational requirements of the contract are.

2. The Amended Complaint of the United States contends that at approximately 2300 hrs PDT, July 16th, 2013 one of the Navy's 36' patrol boats (36PB0605) manned by Navy and Marine Corp personnel allided with a mooring buoy in the vicinity of the explosive handling wharf at Naval Base, Kitsap-Bangor.

2

3. The Amended Complaint of the United States contends that the mooring buoy was improperly lit because the light had become obscured and therefore improperly lit and was the proximate cause of the damage to the vessel. Plaintiff claims that the buoys mooring line had wrapped around the mooring buoy light, thereby obscuring the light rendering it unsafe and a hazard to navigation.

4. Mr. M. E. Devry issued a letter of demand to EHW Constructors on January 6th, 2015. In it he says that "Our <u>investigation</u> and understanding indicates this allision is the fault of EHW Constructors." There is no evidence in this case to support that an accident or investigation report was ever done. And if it was done EHW was not asked to participate in the investigation and denies seeing any report as well.

5. Although there were no accident or investigation report it is obvious that significant damage had occurred to the patrol boat as a result of the allision. A damage inspection was performed by Mr. Joe Maguire on July 17th, 2013. The 36PB0605 had to be trailered due to the extent of the damages. The port side hull pontoon was severely damaged from stem/keel past the crash bulkhead to frame 3. The port side exterior hull plating was buckled with several welds broken. The stem/keel itself was damaged. And the internal structure forward of the crash bulkhead was heavily deformed with some tearing of internals evident.

6. The settlement demand and the cost to repair the damage to the patrol boat was $204,000. This repair cost also indicates a significant amount of damage to the patrol boat.

7. It is unclear to the writer if there was a barge moored at the buoy or not at the time of the accident. Photo disclosures marked USA000180, 189, 202, 203, and 204 seem to show the buoy in question with no barge moored there. However, all these photos also show a second buoy in the immediate vicinity that does have a barge tied up to it.

8. Rule 5 of the Steering and Sailing Rules under the 72 COLREGS contains the "Look Out" rule. Its states that "Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision." Additionally, Rule 7 under the same 72 COLREGS, under (b), states that "Proper use shall be made of radar equipment if fitted and operational, including long-range scanning to obtain early warning of risk of collision and radar plotting or equivalent systematic observations of detected objects." In layman's terms this means that the Operator of the U.S. Navy patrol boat had the obligation to post a look-out. (or deem himself the look-out) He also had the obligation to utilize radar on his vessel if available. While there is no evidence in documents that I have read that the vessel was radar equipped, it is more than likely that for a vessel of this size and sophistication that radar was part of the vessels electronic package.

9. R. Meyers was the Captain of the Tug M/V Gibson on July 16th, 2013. He and his crew were responsible for lighting the buoy and also the barges at the buoy. The wheelhouse log of the day in question shows the barges moored to the buoy and the

3

buoy itself were illuminated with white lights. (Log entry of the Gibson: 1600-1620 Install white lights on barges and buoy and Ringer 1.) This log entry indicates that a barge or barges were moored at the buoy before dusk on the evening of July 16th.

Opinions:
1. The log of the Tug Gibson indicates that the mooring buoy was lighted on the evening of July16th. Barge or barges at the buoy at the time were also lit on all four corners. I believe that this was the likely case at the time the patrol boat allided with the buoy and the plaintiff has presented no evidence to support that the light was obscured.

2. Even if the mooring buoy did not have barges attached at the time I believe it was unlikely that mooring lines could have obscured the light on the buoy to the point that it could not be seen by a prudent operator standing a proper look-out.

3. If there were barges at the mooring at the time of the allision he should have seen them and known that they were obviously tied to a buoy. Photos indicate that there was an additional buoy with a barge moored near the one that was struck by the patrol boat. (observation #7) That same barge could very well have been present on the evening of the allision. The location of the buoy was posted in the Coast Guard Notice of Mariners. The mooring locations were pre-approved by the Navy and the locations known. All of these factors should have put the operator of the Patrol Boat on notice and he knew or should have known that there was a multiple buoys and barges in the area regardless of whether lighting was obscured or not.

4. The damage to Patrol Boat 36PB0605 indicates that it was travelling at an excessive, unsafe, and negligent rate of speed.

5. The Operator of the Patrol Boat had an obligation under COLREGS, rule #7 to post a proper look-out (Observation #8) It is my opinion that he did not do so. If he was standing a proper look-out or utilizing his radar as required under rule #7 he would have detected the buoy in time to take proper action to avoid the allision.

6. 33CFR80.1395 contains the Navigation Rules under the 72 COLREGS that applies to all waters of Puget Sound and adjacent waters, including Hood Canal and the Naval Base Kitsap-Bangor area. Under these Navigation Rules there are no requirements for the lighting of mooring buoys. In my experience barge mooring buoys are generally not lit. There are several barge mooring buoy installations in the Puget Sound area that I have had the opportunity to moor barges at including Olympia, Commencement Bay, (Tacoma), Elliott Bay, (Seattle), Shilshole Bay, (Ballard), Bremerton Harbor, Port Townsend Harbor, and Everett Harbor. To my knowledge none of these buoys are lit and lighting is not required.

7. It is my opinion that the primary cause of this allision was the negligence of the Patrol Boat operator. He knew or should have known that there was a buoy in the area yet he was traveling at a high rate of speed at night, he was not standing a proper look-out, and was unable to avoid hitting a lighted buoy.

I reserve the right to amend this report should further information become available.

Respectfully submitted,

R. Russell Johnson

EXHIBIT 2

R. Russell Johnson
RJ Maritime Associates, LLC
465 Davis Bay Road
Lopez Island, Washington 98261

Date: September 27th, 2017
Subject Opinion: USN vs EHW Construction

---

SUPPLEMENTAL OPINION REPORT

I have been asked by Mr. Paul Smith, of the law firm Forsberg & Umlauf, to provide a professional opinion of the circumstances surrounding the collision of a high speed patrol boat operated by U.S. Navy personnel with a mooring buoy near the explosive handling wharf near Naval Base Kitsap-Bangor. I filed my initial opinion report on this matter on August 16th, 2017. Since that opinion report I have received additional documentation in this matter. Accordingly, I am offering a supplemental opinion report.

In preparation for this report I have reviewed the following additional documents:
1. USA's Discovery Responses in this matter
2. The "Command Investigation" into this casualty conducted by the Marine Corps
3. A single page list of some of the navigational and safety equipment that was supposed to be on board the Moose Boat.

Based on this experience and the review of the above-mentioned documents I have arrived at the following additional observations and opinions:

Observations:

1. MA3 Horvath, MA3 Pena, and MA3 Gervais were assigned to the Moose Boat on patrol on the evening of July 6th, 2013. MA3 Horvath was the Coxswain at the time of the casualty. Command Investigation (USA 000258)

2. The Command Investigation, Finding of Facts states that at the time of the accident weather conditions were – rainy, time was – evening, visibility was – poor. (USA 00258), Evidence provided from enclosure #13 CG-2692

3. The Command Investigation, Finding of Facts states that "Placement of mooring lines on top of the buoy restricted visibility of the buoy light from certain angles." (USA 000259) Evidence provided from enclosure #21.

4. The Command Investigation, Finding of Facts states that the "Patrol Craft was traveling at 7 – 10 knots". (USA 000259) Evidence provided from enclosure #15 & 19.

1

5.  The Command Investigation, Finding of Facts states that "Waterfront Restricted area PSO states: during periods of restricted visibility craft shall adjust speed to fit existing conditions so that it can take proper and effective action to avoid collision and be stopped within an appropriate distance. If visibility is reduced to less than 300 yds, HSB's will proceed at minimum speed only." (USA 000259) Evidence provided from enclosure #22.

6.  The Command Investigation Opinion states that "Placement of mooring line atop of buoy and approach angle of the boat would have greatly reduced the visibility of the buoy to the boat operator during low light/night time hours". (USA 260) Evidence provide from FF8.

7.  The Command Investigation Opinion states that "Cause of accident was from improperly light buoy". (USA 000260) Evidence from FF8 & 9.

8.  The Command Investigation Opinion states that "MA3 Horvath injury and accident was in the line of duty and not due to misconduct." (USA 000260) Evidence from FF5, 9, 11. I find this conclusion particularly unusual considering that the Command Investigation Recommendations include "Recommend that the HSB conduct refresher training to all level 2 coxswains in regards to low visibility operations." (USA 000261) If the accident occurred in the line of duty with no misconduct why would re-training be required?

9.  In the Voluntary Statement of MASN Mark McCartney he states that "they (the Patrol Craft) was traveling between the barges because of how far apart they were at this time". (USA 000300)

10. In the Voluntary Statement of MA3 Jose Pena he states that "During the time of trailing into the pier, MA3 Gervais was posted as the immediate gunner and was brought in by MA3 Horvath due to restricted visibility from the piers blinding lights." The vessel collided with a mooring buoy, "a buoy we did not see or have any way of knowing it was there…….The lights from the pier was not any help either". Pena also states that the speed of the Patrol Craft was 10 -12 knots. (USA 000301)

11. In the Voluntary Statement of MA3 Gervais he states that his position on the Patrol Craft at the time of the allision with the buoy was "At the back of the cabin <u>faced away from</u> the coxswain and gunner". (USA 000302)

12. In the Voluntary Statement of MA3 Horvath he states that "As Hotel 3, I am supposed to keep my vessel within 50-500 feet of the asset moored in the EHW". He continues…"Weather conditions consisted of thunderstorms with a light rain, temperature between 50 - 60 degrees and visibility of <u>less than 50 yards</u>. As I approached Marginal Pier, I was traveling at 7 – 10 knots, RPM's 1900." (USA 000305)

2

13. There is no statement of facts or opinion in all the evidence to indicate that MA3 Horvath or the crew of the Patrol ever used or considered the use of a search light to illuminate a path of approach to the pier.

14. The Moose Boat was fitted with a Raymarine RL70CRC radar using a 4 KW radar scanner with the capability to scan up to a 48 mile radius. I am personally familiar with this model of Raymarine radar, having used the same model on a recreational sailboat that I owned in the past. It is perfectly capable of picking up large mooring buoys on the radar screen if properly tuned and utilized.

Opinions:
1. The Findings of Fact observation #3 claim that the placement of the mooring lines on top of the buoy restricted the buoy light from certain angles. There is no way they could have known this to be a fact. A photo of the buoy (Enclosure 21) is given as evidence that this was the case. It is unknown when this photo was taken however we do know it was not taken on the evening of the allision and cannot represent evidence that the light was obscured. It is highly unlikely that the mooring lines from the buoy could have stayed in position as indicated in the photo following a violent collision with a Patrol Boat and this photo was taken in the daylight. We do know that the log of the Tug Gibson indicates that the mooring buoy was lighted on the evening of July16th. I believe that this was the likely case at the time the patrol boat allided with the buoy and the plaintiff has presented no evidence to support that the light was obscured.

2. There is evidence to support the fact that regardless of the position of the mooring lines there is likelihood that the buoy light could not be easily seen. In the Voluntary Statement of MA3 Jose Pena he states that "During the time of trailing into the pier, MA3 Gervais was posted as the immediate gunner and was brought in by MA3 Horvath due to <u>restricted visibility from the piers blinding lights</u>" in the background. (see observation #11) I have faced this situation countless times trying to pick up channel navigation buoys and running lights from other craft when approaching a harbor from sea and it is extremely difficult. Often, radar or a strong search light are the only tools that can be relied on. There is no evidence to support that radar or a search light was utilized.

3. Despite being brought into the wheelhouse to act as lookout due to the blinding lights at the time of the allision MA3 Gervais was looking aft, and was "At the back of the cabin faced away from the coxswain and gunner". (Observation #12) He was not looking forward scanning the horizon. My previous opinion that the Operator of the Patrol Boat had an obligation under COLREGS, rule #7 to post a proper look-out (Observation #8) stands. It is my opinion that he did not do so. If he was standing a proper look-out or utilizing his radar as required under rule #7, despite the blinding lights of the dock, he could have detected the buoy in time to take proper action to avoid the allision.

3

4. As stated in observation #5, the Investigation Findings of Fact reiterate that: Waterfront Restricted area PSO states: during periods of restricted visibility craft <u>shall adjust speed to fit existing conditions</u> so that it can take proper and effective action to avoid collision and be stopped within and appropriate distance. If visibility is reduced to <u>less than 300 yds</u>, HSB's will proceed at <u>minimum speed only</u>. Notably, the COLREGS, Rule 6, also states that vessels shall proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the <u>prevailing circumstances and conditions.</u> We know that the conditions were nighttime, rainy, with poor visibility. MA3 Horvath in his statement says that the visibility at the time <u>was less than 50 yards</u> and that he was traveling at 7-10 knots at 1900 RPM's, clearly NOT minimum speed. It is my opinion that this speed is excessive given the conditions and is in clear violation of the Waterfront Restricted area PSO and COLREGS Rule 6.

5. Although the Command Investigation opinion was that MA3 Horvath injury and accident was in the line of duty and not due to misconduct, they nevertheless recommended that the HSB conduct refresher training to all level 2 coxswains in regards to low visibility operations. (Observation #8) This decision indicates to me that either MA3 Horvath was not following proper procedures for low visibility operations, or that the HSB training was inadequate in the first place. In either case MA3 Horvath was not operating in accordance with accepted maritime practices and regulations for low visibility navigation.

6. After careful consideration of the additional material I have reviewed, my opinion remains that the proximate cause of this allision was the negligence of the Patrol Boat operator. He was traveling in an area that he was familiar with, between barges that he knew or should have known were attached to buoys. Buoys that were pre-approved by the Navy, identified in the mooring plan, and were posted in the Notice of Mariners. Yet he was traveling at an excessive rate of speed, at night in severely restricted visibility. He was not utilizing radar, he was not standing a proper look-out, he was not utilizing a search light, and was not able to avoid hitting a lighted buoy.

I reserve the right to amend this report should further information become available.

Respectfully submitted,


R. Russell Johnson